IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**THE CRACKED EGG, LLC,**

      **Plaintiff,**

  v.                        **No.** 2:20-cv-1434

**COUNTY OF ALLEGHENY, a political
subdivision of the Commonwealth of
Pennsylvania and the ALLEGHENY
COUNTY HEALTH DEPARTMENT,**

      **Defendants.**

## COMPLAINT

AND NOW, the Plaintiff, The Cracked Egg, LLC, by and through its attorneys, Robert O Lampl, James R. Cooney, Ryan J. Cooney, Sy O. Lampl, Alexander L. Holmquist, Dennis M. Blackwell and Nicolette A. Blackwell, files the within Complaint:

1. The Plaintiff is The Cracked Egg, LLC, d/b/a the Crack'd Egg (Crack'd Egg), a Pennsylvania Limited Liability Company located at 4131 Brownsville Road, Pittsburgh, PA 15227.

2. The Defendant, County of Allegheny (the County), is a home rule county and political subdivision of the Commonwealth of Pennsylvania.

3. The Defendant, Allegheny County Health Department (the ACHD), is a local health department organized under the Local Health Administration Law.

1

**Jurisdiction and Venue:**

4.     This Honorable Court has jurisdiction over this proceeding pursuant to *28 U.S.C. Section 1331*.

5.     Venue of this action is appropriate in the Western District of Pennsylvania pursuant to *28 U.S.C. Sections 1391 (b) (1) and 1391 (b) (2)*.

**Background:**

6.     The Crack'd Egg operates a family restaurant in the Brentwood Section of the City of Pittsburgh.

7.     The Crack'd Egg serves breakfast and lunch and is open from 7:00 AM to 2:00 PM on Monday through Saturday.

8.     The Crack'd Egg has been open for business since October 5, 2015 when the ACHD issued a permit for its operation as a restaurant.

**The "disaster" declarations:**

9.     On March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency in response to the COVID-19 pandemic. A true and correct copy of the Proclamation is attached hereto as Exhibit "A."[1]

10.     The Governor's Proclamation was issued pursuant to the Emergency Management Services Code, *35 Pa.C.S. 7101 et seq.*

11.     The Governor's emergency powers under the Code are set forth in *35 Pa.C.S. 7301 (c)*, which provides in relevant part, that:

> **(c) *Declaration of disaster emergency.*** — A disaster emergency shall be declared by executive order or pro-clamation of the Governor upon finding that a disaster

---

[1] The Governor has extended the Disaster Proclamation twice. The Proclamation was first extended on June 3, 2020 and extended for a second time on August 31, 2020. See Exhibits "B" and "C" hereto.

2

has occurred or that the occurrence or the threat of a
disaster is imminent. The state of disaster emergency
shall continue until the Governor finds that the threat or
danger has passed or the disaster has been dealt with
to the extent that emergency conditions no longer exist
and terminates the state of disaster emergency by exec-
utive order or proclamation, but no state of disaster emer-
gency may continue for longer than 90 days unless re-
newed by the Governor.

12.     In connection with the Governor's Proclamation, on July 1, 2020,

the Secretary of the Pennsylvania Department of Health issued an Order

"requiring universal face coverings." A true and correct copy of the Order is

attached hereto as Exhibit "D."

13.     In issuing her Order (Exhibit "D"), the Secretary failed to comply

with the mandatory rule making procedure required under the Commonwealth

Documents Law (45 P.S. 1102 et seq.), the Regulatory Review Act (71 P.S.

745.1 et seq.) and the Commonwealth Attorneys Act (71 P.S. 732-101 et seq.).

14.     On July 16, 2020, Governor Wolf issued an Order "Directing

Targeted Mitigation Measures."  A true and correct copy of the Order is attached

hereto as Exhibit "E."

15.     Pursuant to the "Targeted Mitigation Measures," (Exhibit "E"),

among other things, restaurants were limited to the lesser of:

A.     25% of fire code stated maximum occupancy for indoor dining; or

B.     25 persons including staff.

16.     In issuing his Order (Exhibit "E"), the Governor failed to comply with

the mandatory rule making procedure required under the Commonwealth

Documents Law (*45 P.S. 1102 et seq.*), the Regulatory Review Act (*71 P.S. 745.1 et seq.*) and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.*).

**The "closure" Order:**

17.     On August 11, 2020, the ACHD conducted an inspection of the Crack'd Egg's restaurant.

18.     As the result of its inspection, the ACHD issued a Food Safety Assessment Report. A true and correct copy of the Food Safety Assessment Report is attached hereto as Exhibit "F."

19.     As indicated, the ACHD ordered that the restaurant be closed "for failure to comply with mask or facial covering guidelines."

20.     The Report did not cite any failure of the Crack'd Egg to comply with published rules or regulations, but instead, relied solely upon the Secretary's Order of July 1, 2020 "requiring universal face coverings."

21.     By its letter dated August 11, 2020, the ACHD suspended the Crack'd Egg's Health Permit and ordered the Crack'd Egg to close. A true and correct copy of the letter is attached hereto as Exhibit "G."

22.     As indicated, the suspension letter asserts that "An inspection of your facility on 8/11/20 indicates an imminent hazard to public health."

**The state court case:**

23.     On September 16, 2020, the ACHD filed a Complaint in Civil Action-Equity against the Crack'd Egg.

24.    The Complaint was filed in the Court of Common Pleas of Allegheny County at Docket No. GD-20-009809. The Crack'd Egg hereby incorporates the averments of the Complaint herein as if set forth in their entirety.

25.    In its Complaint, the ACHD has asserted, among other things, that the Crack'd Egg has:

A.    Failed to comply with mask or facial covering guidelines.

B.    Failed to sufficiently space its outdoor seating.

26.    ACHD's Complaint requests:

A.    A declaratory judgment declaring that the Crack'd Egg has failed to comply with "control measure orders."

B.    An injunction to prevent the Crack'd Egg from operating its business "until a compliance plan is approved by the ACHD."

C.    Payment of fines and civil penalties.

27.    In connection with its Complaint, the ACHD has also filed an Emergency Motion for Preliminary Injunction.

28.    The ACHD did not employ the Sheriff to serve the Complaint and Motion as required by the Pennsylvania Rules of Civil Procedure.

29.    Instead, the Complaint and Motion were improperly served by E-mail on Thursday afternoon (September 17, 2020) for an emergency hearing scheduled for Monday morning (September 21, 2020). In fact, the original E-mail failed to identify the subject or contents, but instead, it simply indicated that "A package has been posted for you." See Exhibit "H" hereto.

5

30.     Not knowing what the "package" was, the owners of the Crack'd Egg were afraid to open it. The following day, Counsel for the ACHD sent a second E-mail which identified the "package" as an Emergency Motion. See Exhibit "I" hereto.

31.     The Crack'd Egg believes and therefore avers that the failure to effectuate proper service was calculated to allow the ACHD to obtain its requested relief in an *ex parte* manner without any opposition.

32.     On September 18, 2020, the Crack'd Egg filed a Notice of Removal to this Honorable Court pursuant to *28 U.S.C. Sections 1331, 1441 and 1446.*

**The within case:**

33.     The Crack'd Egg now files the within case for violation of its civil rights pursuant to *42 U.S.C. 1983.*

34.     The ACHD, as an arm of the County (a political subdivision of the Commonwealth of Pennsylvania), was clearly acting under color of state law for purposes of *42 U.S.C. 1983.*

35.     The ACHD has violated the Crack'd Egg's civil rights while acting under color of state law as is more fully set forth below. Among other things:

A.     The "orders" which the ACHD has attempted to enforce have no valid basis in law.

B.     The Secretary of Health failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.),* the Regulatory Review Act (*71 P.S. 745.1 et seq.)* and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.).*

C.      The Governor failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.*), the Regulatory Review Act (*71 P.S. 745.1 et seq.*) and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.*).

D.      The sole basis for the ACHD's closure Order was the Universal Face Covering Order issued pursuant to the Governor's Emergency Declaration under *35 Pa.C.S. 7301 (c)*. However, the Governor has illegally extended "the emergency" contrary to both federal and state law.

E.      The Secretary of Health's Order "requiring universal face coverings" was issued in violation of the separation of powers doctrine.

F.      The Governor's Order "Directing Targeted Mitigation Measures" was issued in violation of the separation of powers doctrine.

G.      There is no rational or scientific basis for the Order requiring universal face coverings.[2]

H.      There is no rational or scientific basis for the Order "Directing Targeted Mitigation Measures."

I.      The ACHD's actions have deprived the Crack'd Egg of due process of law, both procedurally and substantively.

J.      The closure order will deprive the owners of the Crack'd Egg of their right to make a living.

K.      The ACHD's actions have deprived the Crack'd Egg of equal protection under the law.

_____

[2] Scientific evidence on the efficacy of face masks is conflicting. For example, Cyril H. Wecht, M.D., J.D., the former Coroner of Allegheny County, has stated that the mandatory mask order is "totally absurd."

L.      The ACHD's actions have violated the Crack'd Eggs rights to freedom of speech.[3]

## COUNT 1:

### The Orders are not enforceable:

36.     The Plaintiff hereby incorporates paragraphs 1 through 35 above as if set forth in their entirety.

37.     On July 1, 2020, the Secretary of the Pennsylvania Department of Health issued an Order "requiring universal face coverings." (See Exhibit "D" hereto).

38.     In issuing her Order, the Secretary failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.*), the Regulatory Review Act (*71 P.S. 745.1 et seq.*) and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.*).

39.     On July 16, 2020, Governor Wolf issued an Order "Directing Targeted Mitigation Measures." (See Exhibit "E" hereto).

40.     In issuing his Order, the Governor failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.*), the Regulatory Review Act (*71 P.S. 745.1 et seq.*) and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.*).

41.     The law is clear that:

> The Commonwealth Documents Law, the Regulatory Review Act, and the Commonwealth Attorneys Act establish a mandatory, formal rulemaking procedure that is, with rare exceptions, required for the promulgation of all regulations. *See Germantown*

[3] The Crack'd Egg believes that the ACHD's actions have been motivated, at least in part, by the Crack'd Egg's postings on Facebook.

> *Cab Co. v. Philadelphia Parking Auth.*, 993 A.2d 933, 937 (Pa.
> Cmwlth. 2010), *aff'd*, 614 Pa. 133, 36 A.3d 105 (2012). Under the
> Commonwealth Documents Law, an agency must give notice to
> the public of its proposed rulemaking and an opportunity for the
> public to comment. Section 201 of the Commonwealth Documents
> Law, 45 P.S. § 1201; *Borough of Bedford v. Dept. of Envtl. Prot.*,
> 972 A.2d 53 (Pa. Cmwlth. 2009). Under the Regulatory Review Act,
> the agency must also submit its proposed regulation to IRRC for
> public comment, recommendation from IRRC, and, ultimately,
> IRRC's approval or denial of a final-form regulation. Section 5 of
> the Regulatory Review Act, *as amended*, 71 P.S. § 745.5. The
> Commonwealth Attorneys Act requires the agency to submit all
> proposed regulations to the Attorney General and Governor's
> Office of General Counsel for review of the form and legality.
> 71 P.S. §§ 732-204(b), -301(10).

*Naylor v. Commonwealth*, 2012 Pa. Commw. LEXIS 285, 54 A.3d 429, 433-434

(2012). See also, *Northwestern Youth Services v. Dep't of Public Welfare,* 620

Pa. 140, 66 A.3d 301 (2013).

42.    In enacting the Orders at issue in the present case, both the

Governor and the Secretary of Health wholly failed to comply with these

requirements.

43.    Such failure clearly causes the Orders to be unenforceable as a

matter of law. See, *Germantown Cab Co. v. Philadelphia Parking Authority,* 614

Pa. 133, 36 A.3d 105 (2012) and cases cited therein.

## COUNT 2:

## The Defendants (and the Governor)

## have improperly extended the "emergency powers":

44.    The Plaintiff hereby incorporates paragraphs 1 through 43 above as

if set forth in their entirety.

45.     On March 6, 2020, Pennsylvania Governor Tom Wolf issued his first Proclamation of Disaster Emergency (See Exhibit "A").

46.     Pursuant to *35 Pa.C.S. 7301 (c),* the Governor's emergency powers under the Emergency Management Services Code only last for 90 days unless the disaster emergency is "renewed" by the Governor.

47.     On April 13, 2020, the Supreme Court of Pennsylvania issued its opinion in the case *Friends of Devito v. Wolf,* 2020 Pa. LEXIS 1987, 227 A.3d 872 (2020). In *Devito,* the plaintiffs filed a Petition for King's Bench Jurisdiction asserting that the Governor lacked the authority to order the closure of "non-life-sustaining businesses." The Pennsylvania Supreme Court held that the Governor's Order was within his emergency powers since the closure was "temporary. " As stated by the Court:

> We consider the appropriateness of the due process afforded in light of the fact that the **loss of Petitioner's property rights are temporary and find this signify-cant**. The temporary deprivation impact effects each of the factors in the *Mathews* balancing test. While the private interest, the closure of the business, is important, the risk of erroneous temporary deprivation does not outweigh the value of additional or substitute safeguards which could not be provided within a realistic timeframe.

(emphasis added).

48.     On June 3, 2020, the Governor extended the Disaster Proclamation for the first time. See Exhibit "B" hereto.

49.     On August 24, 2020, Governor Wolf sent a letter to the Members of the Senate of Pennsylvania. In his letter, the Governor advised the Senate that:

> In July, I extended that initial Order through August 31st. Unfortunately, given my authority under the Emergency

> Services Management Code, an executive order further
> extending protections from foreclosure and eviction is
> not a viable option. Any further relief must be a product
> of the Legislature.

A true and correct copy of the Governor's August 24, 2020 letter to the Senate is

attached hereto as Exhibit "J."

50.     Despite his letter to the Senate, on August 31, 2020, Governor Wolf

extended the Emergency Declaration for a second time. See Exhibit "C" hereto.

51.     The Crack'd Egg believes that the second extension constituted an

abuse of the Governor's emergency powers. In fact, the Governor's letter (Exhibit

"J") is an admission that he lacked the power to issue a further extension.

52.     In *County of Butler v. Wolf,* 2020 U.S. Dist. LEXIS 167544 (W.D.

Pa. 2020), the Honorable William S. Stickman, IV held that the second extension

constituted an abuse of power by the Governor.  As stated by Judge Stickman:

> It is true that under 35 Pa.C.S.A § 7301(c), the Governor's
> declaration of emergency, and related measures, will expire
> after ninety days. However, the Governor is able to *sua sponte*
> issue a continued emergency declaration. In *Wolf v. Scarnati,*
> __A.3d__, 2020 Pa. LEXIS 3603, 2020 WL 3567269 (Pa. Jul. 1,
> 2020), the Pennsylvania Supreme Court held that a vote of the
> legislature was powerless to vitiate the declaration, unless the
> governor signed off (as in normal legislation). *See* 2020 Pa.
> LEXIS 3603, ("because H.R. 836 was not presented to the
> Governor, and, in fact, affirmatively denied the Governor the
> opportunity to approve or veto that resolution, H.R. 836 did not
> conform with the General Assembly's statutory mandate in sec-
> tion 7301(c) or with the Pennsylvania Constitution.").
>
> Thus, in practical effect, absent a veto-override, the Governor's
> orders can be reissued without limit. Professors Wiley & Vladeck
> recognized that this situation could lead to the situation of the per-
> manent emergency: "[a]t least under federal law, emergencies,
> once declared, tend not to end; the President can unilaterally ex-
> tend national emergency declarations on an annual basis in per-
> petuity, and can be stopped only by veto-proof supermajorities of
> both houses of Congress. And unless courts are going to rigorous-
> ly review whether the factual justification for the emergency mea-

sure is still present[,] . . . the government can adopt measures that wouldn't be possible during "normal" times long after the true exigency passed." Wiley & Vladeck, *supra page 16, at 187*. On August 31, 2020, the Governor renewed the emergency declaration, extending his extraordinary authority for an additional ninety days. (ECF No. 73-1). Again, absent an extraordinary veto-proof vote of the General Assembly, there is no limit on the number of times the Governor may renew the declaration and vest himself with extraordinary unilateral powers.

53.     In his Dissenting Opinion in the case of *Calvary Chapel Dayton Valley v. Sisolak*, 2020 U.S. LEXIS 3584 (July 24, 2020), the Honorable Justice Samuel Alito agreed with Judge Stickman as follows:

> A public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights.

54.     These principles clearly apply in the present case.

## COUNT 3:

## The Orders violate the

## separation of powers doctrine:

55.     The Plaintiff hereby incorporates paragraphs 1 through 54 above as if set forth in their entirety.

56.     As set forth above, both the Secretary of Health and the Governor failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.*), the Regulatory Review Act (*71 P.S. 745.1 et seq.*) and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.*).

57.     Accordingly, the Orders are nothing more than an attempt to control

the citizens of the Commonwealth of Pennsylvania by executive fiat.

58.     As such, the Orders violate the doctrine of separation of powers.

59.     The law is clear that:

> The doctrine of separation of powers is concerned with the
> allocation of official power among the three co-equal branches
> of our Government. The Framers "built into the tripartite Federal
> Government . . . a self-executing safeguard against the encroach-
> ment or aggrandizement of one branch at the expense of the
> other." *Buckley* v. *Valeo*, 424 U.S. at 122. Thus, for example, the
> Congress may not exercise the judicial power to revise final
> judgments, *Plaut* v. *Spendthrift* [*700] *Farm, Inc.,* 514 U.S. 211,
> 131 L. Ed. 2d 328, 115 S. Ct. 1447 (1995), or the executive
> power to manage an airport, see *Metropolitan Washington Airports
> Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S.
> 252, 276, 115 L. Ed. 2d 236, 111 S. Ct. 2298 (1991) (holding that "if
> the power is executive, the Constitution does not permit an agent of
> Congress to exercise it"). See *J. W. Hampton, Jr., & Co.* v. *United
> States,* 276 U.S. 394, 406, 72 L. Ed. 624, 48 S. Ct. 348 (1928)
> (Congress may not "invest itself or its members with either execu-
> tive power or judicial power"). Similarly, the President may not
> exercise the legislative power to authorize the seizure of private
> property for public use. *Youngstown,* 343 U.S. at 588. And, the
> judicial power to decide cases and controversies does not include
> the provision of purely advisory opinions to the Executive, or permit
> the federal courts to resolve nonjusticiable questions.

*Clinton v. Jones,* 520 U.S. 681, 699-700, 117 S. Ct. 1636, 1647, 137 L. Ed. 2d

945, 964 (1997).

60.     The case of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 72 S.Ct. 863, 96 L. Ed. 1153 (1952) is directly on point. In *Youngstown,* the

Supreme Court of the United States held that the president, as part of the

executive branch, lacked the power to enact legislative rules. As stated by the

Court:

Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the President. In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. The first section of the first article says that "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ." After granting many powers to the Congress, Article I goes on to provide that Congress may "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

This same analysis clearly applies to state governments.

61.     In *County of Butler v. Wolf,* 2020 U.S. Dist. LEXIS 167544 (W.D.

Pa. 2020), the Honorable William S. Stickman, IV made the following observation

that is relevant to the separation of powers issue:

> There is no question that our founders abhorred the concept of one-person rule. They decried government by fiat. Absent a robust system of checks and balances, the guarantees of liberty set forth in the Constitution are just ink on parchment. There is no question that a global pandemic poses serious challenges for governments and for all Americans. But the response to a pandemic (or any emergency) cannot be permitted to undermine our system of constitutional liberties or the system of checks and balances protecting those liberties. Here, Defendants are statutorily permitted to act with little, if any, meaningful input from the legislature. For the judiciary to apply an overly deferential standard would remove the only meaningful check on the exercise of power.

62.     In fact, the Pennsylvania Legislature has attempted to limit or

terminate Governor Wolf's exercise of the emergency powers.

63.     On June 9, 2020, the Pennsylvania Senate and the Pennsylvania

House of Representatives adopted a concurrent resolution that ordered Governor

Wolf to terminate the disaster emergency.

64.     Governor Wolf vetoed the resolution, and on June 11, 2020,

Joseph B. Scarnati, III, the President Pro Tempore of the Senate, filed a

Complaint in Mandamus to enforce the resolution.

65.     In response, Governor Wolf filed a Petition for King's Bench

Jurisdiction to the Supreme Court of Pennsylvania.

66.     In its Opinion, entered on July 1, 2020, the Supreme Court held that

the Legislature could only override the Governor's veto by a two-thirds majority

vote. See *Wolf v. Scarnati*, 2020 Pa. LEXIS 3603 (July 1, 2020). In response to

Scarnati's argument that the governor's veto violated the separation of powers

doctrine, the Majority declined to address the constitutional issue.

67.     Justice Saylor, joined by Justice Mundy, authored a Dissenting

Opinion based upon the separation of powers doctrine. As set forth in the

Dissent:

> I simply cannot envision that the framers of the
> Pennsylvania Constitution contemplated that the
> Governor could be invested with a panoply of ex-
> ceptional powers - including the delegated power
> to suspend laws and commandeer private property
> - but that the Legislature nonetheless would be
> powerless to implement a counterbalance that was
> not then subject to the chief executive's own veto
> power.

## COUNT 4:

### The Plaintiff was

### deprived of procedural due process:

68.     The Plaintiff hereby incorporates paragraphs 1 through 67 above as if set forth in their entirety.

69.     The ACHD suspended the Crack'd Egg's health permit without prior notice and the opportunity to be heard.

70.     Notice and the opportunity to be heard are the touchstones of due process. See, *Armstrong v. Manzo,* 380 U.S. 545, 85 S. Ct. 1187, 14 L.Ed. 2d 62 (1965):

> A fundamental requirement of due process is "the opportunity to be heard." *Grannis* v. *Ordean*, 234 U.S. 385, 394. It is an opportunity which must be granted at a meaningful time and in a meaningful manner.

See also, *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S. Ct. 1983, 1994, 32 L. Ed. 2d 556 (1971); *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L. Ed. 2d 113 (1971).

71.     The ACHD also violated the Crack'd Egg's right to due process by its failure to employ the Sheriff to serve the Complaint and Motion in the state court action as required by the Pennsylvania Rules of Civil Procedure.

72.     Instead, the Complaint and Motion were improperly served by E-mail on Thursday afternoon (September 17, 2020) for an emergency hearing scheduled for Monday morning (September 21, 2020). In fact, the original E-mail

failed to identify the subject or contents, but instead, it simply indicated that "A package has been posted for you." See Exhibit "H" hereto.

73.     Not knowing what the "package" was, the owners of the Crack'd Egg were afraid to open it. The following day, Counsel for ACHD sent a second E-mail which identified the "package" as an Emergency Motion. See Exhibit "I" hereto.

74.     The Crack'd Egg believes and therefore avers that the failure to effectuate proper service was calculated to allow the ACHD to obtain its requested relief in an *ex parte* manner without any opposition.

75.     The law is clear that citizens are entitled to due process even in times of emergency or crisis. See, *Friends of Devito v. Wolf,* 2020 Pa. LEXIS 1987, 227 A.3d 872 (2020):

> We cannot agree, however, with Respondents' contention that Petitioners were not entitled to any procedural due process, either before or after the entry of the Executive Order. Respondents' Brief at 35 ("Viewing the present public health emergency through a *Mathews* lens, it is apparent what balance is to be struck. — No additional safeguards are feasible, and the countervailing public interest is beyond debate."). The Supreme Court has held that at all times, even when the country is at war, essential liberties remain in effect. *Bell v. Burson,* 402 U.S. 535, 542, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971).

76.     The ACHD's violation of the Crack'd Egg's rights to due process of law is clearly actionable under *42 U.S.C. 1983.* See, *Lewis v. N.M. Dep't of Health,* 261 F.3d 970 (10th Cir. 2001) and cases cited therein.

## COUNT 5:

## The Plaintiff was deprived of substantive

## due process: The Owners' right to earn a living

77.    The Plaintiff hereby incorporates paragraphs 1 through 76 above as if set forth in their entirety.

78.    On July 16, 2020, Governor Wolf issued an Order "Directing Targeted Mitigation Measures."  A true and correct copy of the Order is attached hereto as Exhibit "E."

79.    Pursuant to the Targeted Mitigation Measures Order, among other things, restaurants were limited to the lesser of:

A.    25% of fire code stated maximum occupancy for indoor dining; or

B.    25 persons including staff.

80.    As a result of the "Targeted Mitigation Measures," the Crack'd Egg suffered a severe loss of business and income.

81.    According to The Pittsburgh Business Times, the Covid shutdown has caused more than 130 restaurants to go out of business permanently.

82.    The owners of the Crack'd Egg depend upon the income from the Crack'd Egg to pay their living expenses.  In fact, the income loss suffered as the result of the Targeted Mitigation Measures Order made it impossible for the Crack'd Egg to pay its bills.

83.    The ACHD has now suspended the Crack'd Egg's health license and ordered it to shut down until a "plan that is satisfactory to the ACHD" is put into place.

84.    As set forth above, the suspension order was imposed without due process of law and for reasons unrelated to the spread of Covid.

85.    Accordingly, such order violates the Crack'd Egg's substantive due process rights.

86.    In *County of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 167544 (W.D. Pa. 2020), the Honorable William S. Stickman, IV held that:

> A total shutdown of a business with no end-date and with the specter of additional, future shutdowns can cause critical damage to a business's ability to survive, to an employee's ability to support him/herself, and adds a government-induced cloud of uncertainty to the usual unpredictability of nature and life.

87.    The same principle clearly applies in the present case.

## COUNT 6:

### The Plaintiff has been

### deprived of equal protection under the law:

88.    The Plaintiff hereby incorporates paragraphs 1 through 87 above as if set forth in their entirety.

89.    The ACHD (and Governor Wolf) have strictly limited the Crack'd Egg's occupancy limits, while at the same time, they have condoned and participated in large gatherings, including public protests and political gatherings.

90.    These actions clearly violate the Crack'd Egg's right to equal protection under the law.

91.    In *County of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 167544 (W.D. Pa. 2020), Judge Stickman made the following observations which are relevant to the equal protection issue:

While permitting commercial gatherings at a percentage of occupancy may not render the restrictions on other gatherings content-based, they do highlight the lack of narrow tailoring. *See Ramsek*, 2020 U.S. Dist. LEXIS 110668, ("retail stores, airports, churches and the like serve as an inconvenient example of how the Mass Gatherings Order fails at narrow tailoring."). Indeed, hundreds of people may congregate in stores, malls, large restaurants and other businesses based only on the occupancy limit of the building. Up to 20,000 people may attend the gathering in Carlisle (almost 100 times the approved outdoor limit!)—with Defendants' blessing.

Ostensibly, the occupancy restriction limits in Defendants' orders for those commercial purposes operate to the same end as the congregate gathering limits to combat the spread of COVID-19. However, they do so in a manner that is far less restrictive of the First Amendment right of assembly than the orders permit for activities that are more traditionally covered within the ambit of the Amendment—political, social, cultural, educational and other expressive gatherings.

## COUNT 7:

### The Plaintiff is entitled to

### recover attorneys' fees pursuant to *42 U.S.C. 1988*:

92.   The Plaintiff hereby incorporates paragraphs 1 through 91 above as if set forth in their entirety.

93.   *42 U.S.C. 1988* provides in relevant part that a plaintiff in a civil rights action may cover reasonable attorneys' fees as part of the costs.

94.   The Crack'd Egg hereby requests recovery of its reasonable attorneys' fees pursuant to *42 U.S.C. 1988*.

WHEREFORE, the Plaintiff respectfully requests this Honorable Court to enter judgment in favor of the Plaintiff and against the Defendants for the following relief: (1) a declaratory judgment finding that the "emergency orders"

are unconstitutional, and that the Defendants have violated the Plaintiff's civil rights by attempting to enforce such orders ; (2) an injunction to prevent further violations; (3) damages; (4) attorneys' fees pursuant to *42 U.S.C 1988;* and (5) any other relief that is just and appropriate.

Respectfully Submitted,

__/s/ James R. Cooney____
JAMES R. COONEY
PA I.D. #32706

ROBERT O LAMPL
PA I.D. #19809

RYAN J. COONEY
PA I.D. #319213

SY O. LAMPL
PA.I.D. #324741

ALEX L. HOLMQUIST
PA I.D. #314159

Benedum Trees Building
223 Fourth Avenue, 4th Floor
Pittsburgh, PA 15222
(412) 392-0330 (phone)
(412) 392-0335 (facsimile)

DENNIS M. BLACKWELL
PA I.D. #61040

NICOLETTE A. BLACKWELL
PA I.D. #325640

The Blackwell Law Firm
Benedum Trees Building
223 Fourth Avenue
Ninth Floor
Pittsburgh, PA  15222
(412) 391-5299 (phone)

**Attorneys for the Plaintiff**